## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:06cv52

| | | |
|---|---|---|
| REBECCA GARREN LANNING, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| Vs. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| EATON CORPORATION; THE EATON | ) | |
| CORPORATION HEALTH AND | ) | |
| WELFARE ADMINISTRATIVE | ) | |
| COMMITTEE; and BROADSPIRE | ) | |
| NATIONAL SERVICES, INC., | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court upon plaintiff's Motion for Summary

Judgment (#18), defendants' Motion for Summary Judgment (#20), and defendants'

Motion to Strike (#24). Each motion has been fully briefed and an Administrative

Record (hereinafter "A.R."), totaling more than 1000 pages, has been submitted. In

addition, plaintiff has submitted materials supplemental to the A.R. through

attachments to docket entry 19.[1] The undersigned has considered all memoranda

filed in support, opposition, and reply to the various motions, as well as all the

supporting materials. Based on such review, the undersigned respectfully enters the

following findings, conclusions, and recommendations as to plaintiff's claim that

defendant Broadspire, as Claims Administrator, and Eaton, as Plan Administrator,

---

[1] For ease of further review, the undersigned has placed the A.R. in
three binders and the plaintiff's supplemental materials in a fourth.

improperly determined that that plaintiff was ineligible for continued Long Term Disability Benefits. Plaintiff's claims are properly before this court under the Employee Retirement Income Security Act ("ERISA").

## FINDINGS AND CONCLUSIONS

### I.   Introduction

In this action, plaintiff seeks review of the final decision of defendant Eaton Corporation (hereinafter "Eaton") and the underlying decision of the Claims Administrator Broadspire Services, Inc. (hereinafter "Broadspire") which terminated plaintiff's LTD benefits.

Plaintiff was employed by Eaton from July 29, 1980, until June 1, 1999, as an assembly line tester, when she ceased working for Eaton due to osteoarthritis. A.R. 101. Plaintiff received short term disability benefits under the Eaton Corporation Short Term Disability Program from June 2, 1999, through November 28, 1999. A.R.89. Plaintiff then applied for LTD benefits under the first tier of the LTD Plan and those benefits were approved effective November 29, 1999. A.R. 89. In 2001, plaintiff applied for and received second tier LTD benefits under the Plan's then applicable definition of disability.

In terminating plaintiff's LTD benefits in 2004, defendants determined that plaintiff's condition improved and stabilized and that she was not continuously disabled under the terms of the Plan, with benefits being terminated as of July 1, 2004. Defendants based their determinations on: plaintiff's own statements showing

that her condition improved; two office visit notes from 2003, which represent her only contacts with physicians in that year, which defendants read to show improvement and lack of complaints of disabling issues; peer review of plaintiff's medical documentation; the results of a Functional Capacity Evaluation (hereinafter "FCE"); the results of an Employability Assessment; and the results of a Labor Market Survey.

In making such determination, defendants applied the terms of the LTD Plan. There is a dispute between the parties - - which has taken the form of a Motion to Strike - - as to which version of the Plan was applied to the termination of plaintiff's LTD benefits and which plan should have been applied. Such debate was sparked by a discovery request from plaintiff, which garnered the versions of the LTD Plan under which plaintiff was originally granted LTD benefits.

Having considered the administrative decisions alongside the administrative record, it is beyond any doubt that throughout the administrative process at issue in this case, defendants applied the terms of the LTD Plan as it was amended as of June 2, 2001, as reflected in the January 1, 2004, version of the LTD Plan and Summary Plan Description. Further, inasmuch as a company may go so far as to terminate an LTD Plan even as to those receiving benefits, there is no obligation or logical reason why defendants would have applied anything other than the LTD Plan in effect at the time plaintiff's case was reviewed in 2004. Indeed, the initial letter from Broadspire terminating plaintiff's LTD benefits cites at length from the 2004 "Summary Plan Description" (hereinafter "SPD"), going so far as to cite the new "any occupation"

requirement of the 2004 amendment. A.R. 300. Further, such initial letter informs plaintiff that "you or your representative may request to review any pertinent Plan Documents. A.R. 302. Finally, plaintiff's attorney's letter of December 1, 2004, which constituted her initial appeal, acknowledged and cited the June 2001 change in Plan language. A.R. 304.

It is equally clear that the amended version of the LTD Plan, which appears to date from June 2, 2001, imposed a substantially higher threshold than the LTD Plan that was in effect when she was initially awarded benefits. In 1999, plaintiff need only show that she was no longer capable of performing her work with Eaton; as to reviews in or after 2001, plaintiff was then required to show that she was incapable of any work. The 2004 SPD provides, as follows:

> You are considered to have a covered disability (see, "Disabilities NOT Covered" for exceptions) under the Plan if:
>
> * * *
>
> • During the continuation of such total disability following the first 24 months, you are totally and continuously unable to engage **in any occupation** or perform any work for compensation or profit for which you are, or may become, reasonably well-fitted by reason of education, training or experience - at Eaton Corporation or elsewhere.

A.R. 32 (emphasis added). In addition, the SPD requires that a claimant must be under the continuous care of a physician who: "verifies, to the satisfaction of the Claims Administrator" that claimant is disabled. Id. As to what evidence of disability will satisfy the requirements, the 2004 SPD provides, as follows:

> Objective findings of a disability are necessary to substantiate the period of time your physician indicates you are disabled. Objective findings are those that can be observed by your physician through objective means,

not just from your description of the symptoms. Objective findings include:

- Physical examination findings (functional impairments/capacity);
- Diagnostic tests results/imaging studies;
- Diagnosis;
- X-ray results;
- Observation of anatomical, physiological or psychological abnormalities; and
- Medications and/or treatment plan.

A.R. 37. The LTD Plan also requires periodic certification of the participant's disability status, which can include independent medical examinations, medical file and record reviews, and/or functional capacity tests. Id.

Thus, to be entitled to continued benefits, plaintiff was required to show that she was unable to engage in any employment, that she was under the continuous care of a physician who verifies to the satisfaction of the claims administrator that plaintiff is disabled, and that such physician opinion is based on objective findings rather than the subjective reports of disability a plaintiff may provide to her doctor.

## II.    The Administrative Decisions

### A.    Broadspire Denies Continued Coverage

In a letter dated June 24, 2004, Broadspire informed plaintiff that, based upon a review of the records provided, she was capable of returning to work, that she was not continuously disabled under the LTD Plan's definition of disability, and that her LTD benefits would cease as of July 1, 2004. A.R. 300-302. This letter described all of the evidence in support of its determination, gave plaintiff information regarding her appeal rights, and explained the objective medical documentation that would be helpful for her to submit.

## B.  Broadspire Denies Continued Coverage on Initial Appeal

In response to the denial of coverage, plaintiff submitted an appeal of the decision on December 1, 2004, with the assistance of her counsel herein.  Plaintiff supported her appeal with medical documentation and an affidavit.  Such appeal provided that plaintiff was then suffering from the following ailments:

(1)    severe degenerative osteoarthritis;

(2)    cervical and lumbar degenerative disc disease;

(3)    type II diabetes mellitus;

(4)    obesity;

(5)    chronic pain; and

(6)    systemic lupus erythematosus.

Based on such appeal, Broadspire engaged five medical peer reviewers to review plaintiff's file as well as the materials plaintiff submitted with her appeal.  Plaintiff assigns ill motive to defendants' employment of such experts and additional experts upon further review and argues that

> If 'substantial evidence' is merely a numbers game, plan administrators like Defendants will never have to pay a claim, because they will always be able to hire at least one more paper reviewer that the claimant has treating physicians.

Docket Entry 19, at 1.  Plaintiff fails to mention, however, that such employment of separate experts was required by the very language of the Plan to provide claimants with fair review of their claims from experts in the respective fields, and that as a further protection, the same experts could not be used by Eaton in conducting their final review. See A.R. 40.

Based on the allegations in plaintiff's appeal, Broadspire engaged physicians specializing in internal medicine, rheumatology, orthopedic surgery/pain management, general surgery, and obstetrics/gynecology to review plaintiff's case as well as the materials, including the materials submitted on appeal.  In January and February 2005, some of these retained specialized opined as follows:

(1)     Dr. Ira Posner, M.D., a specialist in orthopedic surgery concluded:

> This is an individual whose most significant problem is her morbid obesity. She has vague complaints of problems with her shoulders and knees, but no workup of these joints has been done. Most individuals at this claimant's age and weight do develop significant osteoarthritis of their knees and this may be contributing to this individual's difficulty in returning to functional work activity. Her morbid obesity also contributes to her poor cardiovascular fitness which, according to her Functional Capacity Evaluation, is also restricting her ability to return to work activity. Her documentation indicates that she has had L5-S1 disc surgery and has ongoing degenerative changes in the lumbar spine, particularly at the L4-L5 and L5-S1 levels. She has some stenosis at these levels with some impingement of nerve roots that is most likely contributing to her chronic low back pain as well as the pain radiating into her lower extremities. Her repetitive examinations, however, indicate that she is morbidly obese, but also indicate that there is no evidence of any functional impairment or significant neurological deficit that would preclude sustained work activity at the sedentary level as long as she avoided heavy lifting, prolonged standing or walking, and was allowed to change position as needed based on her symptomatology.

A.R. 675;

(2)     Dr. Tamara Bowman, M.D., a physician specializing in internal medicine and endocrinology, opined

> In summary, the claimant has multiple diagnoses as noted above. Her blood pressure is documented to be well controlled on Lotensin. . . . The provided records document that the claimant's Type II diabetes has historically been under poor control. . . . [T]here is no evidence, during the time period in question, of severe hyperglycemia or frequent

hypoglycemic events requiring emergency room treatment or hospitalization. There is no documentation of any disabling complications of diabetes. The claimant has chronic thrombocytopenia with a platelet count in the range of 100,000. This has been documented to be stable. There is no evidence of leukemia or a malignancy in the claimant, as the etiology of her thrombocytopenia. She has not required further intervention for this. She also has chronic autoimmune thyroiditis resulting in hypothyroidism. She is being replaced with Thyroid hormone, presently in the form of Levoxyl, and based on her normal TSH level; she is on an appropriate replacement dose . . .[She] had symptoms suggestive of obstructive sleep apnea syndrome; however, her overnight polysomnography did not reveal findings consistent with this.

\* \* \*

Therefore, from an internal medicine standpoint, there are insufficient objective clinical findings documented to support a level of functional impairment that would render the claimant unable to perform any occupation, as of 07/01/04.

A.R. 687-88; and

(3)   Dr. Yvonne Sherrer, M.D., a rheumatologist, opined:

On [Dr. Smith's] musculoskeletal exam, though, he describes only "pain" on palpation and range of motion of the low back." He specifically states that there is no pain noted to shoulders, elbows, hands, hips, knees or feet. He does not describe neck pain. He describes no other joint range of motion. He does not describe radicular signs or symptoms, but does not give a specific neurological exam. Likewise, in his 9/29/04 visit, he describes only "polyarthralgias without synovitis or deformity" and "soreness to the low back."

In like manner, progress notes from Dr. Hamilton, the primary care physician, fails to document objective findings on exam that would correlate with the MRI findings.

MRI/radiological findings alone do not determine functional ability or limitations. Clinical correlation is required. Unfortunately, these extensive records document only soreness, tenderness or pain without other corroborating factors. AMA guidelines note that pain in and of itself does not determine functional ability.

It would not be disputed on the basis of these records that this

claimant has low back pain. What is not established on the basis of these records is that the claimant has functional inability on the basis of that pain so as to prevent her from performing "any occupation."

Recent notations by Dr. Smith raised the possibility that the claimant may have an underlying systemic rheumatological process.... Noteworthy on 8/31/04 serologies were done. All were negative except a low titer positive doublestranded DNA and qualitative positive ANA. She had equivocal anti-cardiolipin IgG and normal IgM levels. Complement studies were not made available. Recent creatinine BUN and liver function studies were not made available. Prior studies (2002) were within normal limits.

Thus this claimant may have a mild systemic auto-immune disease. However, objective evidence of disease severity such that would prevent the claimant from performing "any occupation" has not been documented in these records.

There is a questionnaire completed by Dr. Ellison Smith. On question 2, he gives his medical opinion that the claimant is not able to work. However, he does not give any explanation or objective data to support his opinion.

In summary, this claimant has degenerative disease of the spine and pain on the basis. These records do not provide objective data to support that this claimant is so impaired from her degenerative spine disease that she is incapable of performing "any occupation." Further, these records do not support that she is so impaired from her mild possible systemic rheumatic disease that she cannot perform 'any occupation.'

A.R.667-68.

On March 3, 2005, Broadspire sent a second letter to plaintiff denying the December 2004 appeal and upholding its earlier decision A.R. 695-99. Importantly, Broadspire's letter denying this appeal provided plaintiff with the following: (1) its rationale; reference to the applicable Plan language it applied; an extensive and exacting list of the documents that were considered; a summary of plaintiff's impairments; a summary of the Employability Assessment Report; a summary of the

Labor Market Survey; a decision; and a notice of appellate rights. Broadspire further advised that "[i]n preparing your appeal, you may request to review any pertinent plan documents, citing plaintiff's documentation both before and after the benefits cutoff date of July 1, 2004.

### C. Eaton Denies Coverage on Final Appeal

#### 1. Claim File Preparation By Broadspire and Solicitation of Additional Medical Opinions

On August 24, 2005, plaintiff through counsel filed her final administrative appeal to Eaton, which sought review of Broadspire's appeals decision dated March 3, 2005. Plaintiff's appeal included additional medical evidence as well as other materials, and warned that Broadspire had failed to consider plaintiff's impairments in combination. Such new medical evidence included an opinion and medical records of a kidney specialist, A.R. 712, the report of another doctor concerning a negative mammogram and that a thickened endometrium with polyps was removed, A.R. 769, medical evidence concerning a sleep study post dating termination of benefits, A.R. 777-789, post denial rehab records showing increased duration and functionality after seven sessions, but also showing a decision by plaintiff that she did not want to continue with such therapy upon reevaluation, A.R. 801, updated records from treating physicians, A.R. 744-749, and post discontinuance records from Dr. Smith, a rheumatologist, who diagnosed "possible lupus," but describes plaintiff during the same visit as a "healthy appearing individual in no distress," A.R. 763, and then notes five months later that plaintiff "is quite functionally limited by remarkable

number of medical conditions." A.R. 825.

In preparing the file for consideration by Eaton, Broadspire engaged the services of three additional physicians.

On November 1, 2005, the first physician, Dr. Michael Goldman, D.O., a specialist in physical medicine/rehabilitation and pain management, considered plaintiff's entire medical file and determined that plaintiff was capable of sedentary work with limitations.

On November 2, 2005, Dr. Dennis Mazal, M.D., an internal medicine specialist considered evidence concerning plaintiff's high blood pressure, thyroid function, and diabetes, and opined that such conditions appeared to be under control. A.R. 834-838. He concluded that "based upon the information reviewed and considered there is no support for a loss of functionality that would preclude the claimant from performing the essential duties of any occupation during the time period under consideration 7/1/04 and beyond . . . ."

On November 10, 2005, Dr. Nolan Lerner, M.D., a nephrologist, issued an opinion that considered the 2005 medical records regarding kidney function. He concluded that the evidence plaintiff supported, at worse, Stage III chronic kidney disease, but that the documentation and consultation from plaintiff's nephrologist "does not support functional impairment, based on kidney disease, from any occupation as of 7/1/04." A.R. 843.

### 2.    Eaton's Consideration of the File

After gathering three additional medical opinions, Broadspire sent the file to

Eaton for final review. In turn, Eaton submitted the entire record to two independent third party medical reviewers, engaged through Medical Review Institute of America (hereinafter "MRIoA") for a comprehensive, total assessment. The court notes that this is precisely the type of review which plaintiff argued in her final appeal that had not been conducted.

The two MRIoA reviewers were anonymous.[2] The first Eaton specialist practiced orthopedic surgery and occupational medicine and the second specialized in internal medicine and endocrinology.

The first physician reviewer provided a report dated November 30, 2005, in which he reviewed the entire record since 1995, and concluded that plaintiff was not disabled from the Plan's "any occupation" definition. A.R. 69-81. This physician discussed at length the inconsistencies between plaintiff's affidavit, her self-reported activities, and the objective findings of her treating physicians. A.R. 70-73. He considered all of plaintiff's conditions taken together, and concluded as follows:

> With regard to the complaint of low back pain and degenerative osteoarthritis of the lumbar spine, upon review of the records and the physical findings as recorded in the chart, results of imaging studies and observation of pain exaggeration it is certainly reasonable to conclude that this claimant could perform sedentary work, which means lifting up to 10 pounds and with a combination of sitting, standing, and walking through an 8-hour workday.
>
> * * *
>
> Based on the degree of her obesity and her current level of activity there is no reason that her excessive weight would prevent her from

---

[2]     Plaintiff ascribes ill motive to this anonymity in her arguments; however, defendants point out that the names of the reviewers were available to plaintiff upon request, but that she did not request them. The undersigned finds that this assignment of error does not touch on this court's limited review.

accomplishing sedentary work.

* * *

Based on the recorded blood sugars, hemoglobin AIC and the progress of the claimant under expert guidance for diabetic management the prognosis for this condition appears to be good and therefore is not a reason that she could not work outside the home for at least 8 hours in a sedentary job.

* * *

Based on the very excellent control of her blood pressure with a perfect medication, there is no obstacle posed by her hypertension to working on performing a sedentary occupation.

A.R. 75.

With the CPAP her sleep pattern is normal and her blood oxygen level is well maintained. Therefore, CPAP does not constitute an interference with her resuming sedentary work for at least 8 hours a day.

* * *

Based on the good control and correction of hypothyroid state by replacement therapy, hypothyroidism does not constitute an impediment for returning to work in the capacity of sedentary work for an 8-hour day.

* * *

Based on review of the chart and opinions of experts as well as laboratory tests, thrombocytopenia and leucopenia is fluctuating and mild, associated with an enlarged spleen, is not associated with any evidence of bleeding diathesis or increased infections and therefore is not a reason to prevent her from resumption of sedentary work of lifting 10 pounds maximum with sitting, standing and walking for 8 hours with usual breaks.

* * *

The diagnosis of systemic lupus erythematosus has not been firmly established in this patient. There is a lack of physical correlation and the significant occurrence of false positive ANA results cast doubt on this diagnosis. In any event, the lack of physical findings to correlate systemic arthritis would disqualify this diagnosis as a basis for impairment to work. So with regard to the unlikely diagnosis of systemic lupus erythematosus, it would not interfere with her returning to sedentary work with lifting up to 10 pounds and sitting, standing, and walking up to 8 hours with usual breaks.

* * *

The diagnosis of fibromyalgia to satisfy the American College of Rheumatology criteria has not been established in her case. One of the most prominent features of fibromyalgia is chronic fatigue. In her

affidavit of 10/26/05, the claimant does not mention fatigue at all. Therefore, it is my opinion that she does not have fibromyalgia and that this is not a consideration or entity that would interfere with her returning to sedentary work.

A.R. 74-79.

The second MRIoA reviewer for Eaton also filed a written report dated November 23, 2005. A.R. 82-87. The second reviewer's assessment was consistent with the assessment of the first MRIoA reviewer.

Thus, the independent reviewers hired by Eaton both concluded that, based on the entire record and considering plaintiff's ailments in combination that plaintiff was no longer disabled under the terms of the LTD Plan as of July 1, 2004.

Eaton, as Plan Administrator, issued a final determination dated December 9, 2005, which upheld Broadspire's denial of continued LTD benefits after June 30, 2004. A.R.50-67. The letter decision concluded, in pertinent part:

Although Ms. Garren's medical records reflect numerous issues, the records do not reflect that any or all of those conditions would prevent her from performing sedentary work. With respect to Ms. Garren's pain complaints, the medical reviewers have indicated that her subjective complaints are not consistent with available objective medical information and may, in fact, be exaggerated. Ms. Garren has rejected any narcotic pain medication. Her description of pain levels is inconsistent with her level of activity. She has indicated she is able to drive, cook, do dishes, grocery shop and go out to eat. Although physical therapy notes indicated she was able to handle 60 minutes of aquatic physical therapy with good results, and physical therapy seemed to improve Ms. Garren's condition, she ceased receiving such therapy, indicating it was not helpful. In addition, the record is virtually devoid of any medical information during 2003.

With respect to her degenerative disc disease, the reviewer notes that "x-rays of her cervical spine were normal and the lumbar spine degenerative changes correspond to normal results for her age and

surgical intervention." Ms. Garren's diabetes, hypertension and hypothyroidism are noted in the medical records to be under good control. Her thrombocytopenia leukopenia is noted to be mild, and there is no established diagnosis of her systemic lupus erythematosus or fibromyalgia. Ms. Garren's sleep issues do not appear to be significant, and her renal dysfunction is moderate. Ms. Garren's medical conditions, as a whole, as reflected in the medical records, do not support a claim that she is unable to engage in sedentary work.

Although Ms. Garren's physicians have opined that she is unable to work, they do not provide any objective clinical medical evidence to support these opinions. Further, each medical reviewer of Ms. Garren's information concluded that the objective information did not support a finding that Ms. Garren was unable to perform any occupation. A March 17, 2004 functional capacity evaluation reflected an ability to work at the sedentary level. The independent medical reviewers retained by the Plan Administrator concluded that, based on the available medical information, Ms. Garren would not be disabled from any occupation on July 1, 2004. (The independent reviewers will be identified upon written request). The independent medical reviewers' conclusions were based on their review of the medical records.

A. R. 65-66.

### D.    Plaintiff Seeks Judicial Review

Within the time allowed, plaintiff filed suit in this court on February 21, 2006. After a period of discovery, the respective parties filed cross motions for summary judgment, which have been fully briefed.

## III.    Applicable Standards of Review

### A.    Standard Applicable to Cross Motions for Summary Judgment

In this case, the parties have submitted cross motions for summary judgment, wherein each side contends that there are no issues for trial and that judgment may be rendered as a matter of law. Finding that the facts are adequately presented in the administrative record, that the court's review is limited to the administrative record

that was before the Plan Administrator, and that no genuine issues of material fact exist, summary judgment is an appropriate means to resolve the issues presented.

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). To survive summary judgment, there must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are

reasonable, however improbable they may seem. <u>Cole v. Cole</u>, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. <u>United States ex rel. Jones v. Rundle</u>, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. <u>Davis v. Zahradnick</u>, 600 F.2d 458 (4th Cir. 1979).

In this case, cross-motions for summary judgment have been filed. Where cross motions for summary judgment are filed, such motions are

> no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.
> In short, the mere fact that both parties seek summary judgment does not constitute a waiver of a full trial or the right to have the case presented to a jury.

Wright & Miller, 10A Fed. Prac. & Proc. Civ.3d § 2720.

## B.    Applicable ERISA Standard of Review

Where a Plan Administrator is granted discretionary authority by the terms of the Plan to determine eligibility or to construe the terms of the Plan, the denial of benefits must be reviewed for abuse of discretion. <u>See</u> <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989).

> Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently.

<u>Ellis v. Metropolitan Life Ins. Co.</u>, 126 F.3d 228, 232 (4th Cir. 1997). In determining

whether discretion has been abused, the Court of Appeals for the Fourth Circuit has identified the following eight factors for consideration by a reviewing court:

    (1)    the language of the Plan;

    (2)    the purposes and goals of the Plan;

    (3)    the adequacy of the materials considered to make the decision and the degree to which they support it;

    (4)    whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan;

    (5)    whether the decision-making process was reasoned and principled;

    (6)    whether the decision was consistent with the procedural and substantive requirements of ERISA;

    (7)    any external standard relevant to the exercise of discretion; and

    (8)    the fiduciary's motives and any conflict of interest it may have.

Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000).

In addition to development of law at the appellate level, the undersigned also turns for guidance from published opinions at the trial-court level that concern ERISA. The district court has explained, as follows:

> there is a slight change in the deference afforded a plan fiduciary under this standard of review where the plan fiduciary is operating under a conflict of interest. Ellis, supra, at 233. The Supreme Court has recognized that where such a conflict of interest exists, "that conflict must be weighed as a factor in determining whether there is an abuse of discretion." Firestone, supra (quotations omitted). The Fourth Circuit has explained that any conflict of interest is to be judged on a case-by-case basis, and should be regarded as one of several factors in reviewing

-18-

whether the Plan Administrator had abused its discretion. Ellis, 126 F.3d at 233 (citing Haley v. Paul Revere Life Ins. Co., 77 F.3d 84, 89 (4th Cir.1996)). While the reviewing court should never deviate from an abuse of discretion standard, the Fourth Circuit has held that a lessened level of deference should be afforded a plan fiduciary operating under a conflict of interest. Bedrick, supra.

Boyd v. Liberty Life Assurance Co. of Boston, 362 F.Supp.2d 660, 664-65 (W.D.N.C. 2005) (Thornburg, J.). This modified abuse of discretion standard does not, however, come into play in this particular case.

Under ERISA, a Plan fiduciary is obligated to act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). ERISA anticipates that conflicts of interest are inherent in benefit determinations and provides that such conflicts be considered as a factor in determining whether there was an abuse of discretion by a Plan's administrator and fiduciary. Ellis, supra, at 233. Where a conflict is shown, the deference to the decision of the fiduciary "will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." Id.; accord Boyd, supra, at 665.

> The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other Plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

Ellis, supra, at 233.

The mere fact, however, that a company both funds and administers a plan for its employees is not sufficient to show a conflict. Colucci v. Agfa Corp. Severance Pay Plan, 431 F.3d 170 (4th Cir. 2005). In her Memorandum in Opposition to defendants' Motion for Summary Judgment, plaintiff states that Eaton's health

benefits are linked to the receipt of disability insurance benefits, and that such linkage provides Eaton with a financial incentive to improperly terminate benefits. Docket Entry 27, at 3-4. There is no logic to the argument inasmuch as if Eaton found the health benefit costs to disabled workers to be overly burdensome, it could certainly amend its LTD Plan to not provide disabled employees with health benefits or to simply terminate LTD benefits across the board. Plaintiff's argument was squarely rejected by the Court of Appeals for the Fourth Circuit:

> There is a material difference, however, between a corporation whose business profits primarily derive from managing ERISA plans and a corporation that collaterally manages a plan through which it chooses to provide its employees with benefits. We question how a company that creates, funds, and administers a plan for its own employees' benefit can, from those facts alone, be presumed to have a financial conflict in administering that plan when the company remains free to end the plan altogether. The company's business plan could not be dependent on its denying benefits, as might have been the case in Doe, because it could decide to deny all benefits simply by ending the plan should the benefits become too burdensome. When a company sponsors a plan and then administers it, the fact that the benefits cost money is insufficient to support the presumption of a conflict; that cost is the product of its election to provide the employees with benefits.

Colucci v. Agfa Corp. Severance Pay Plan, supra, at 179. This court can take judicial notice that Eaton is clearly not in the business of managing ERISA plans, but instead derives its income from producing a variety of goods. Plaintiff's contention that this court should apply a lesser standard is, therefore, without merit. Thus, the undersigned will apply the Firestone deferential standard, and the final decision of the Plan Administrator will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently.

## IV.    Discussion

This court's review is guided by the factors set forth above in <u>Booth v.</u>
<u>Wal-Mart Stores, Inc. Associates Health and Welfare Plan</u>, <u>supra</u>. The undersigned
will consider the <u>Booth</u> factors seriatim.

### A.    The Language of the Plan

The language of the plan clearly changed from the time when plaintiff was first
found eligible for LTD benefits to the language that was applicable when her benefits
were cancelled. Back in 1999, the Plan language provided coverage if a person was
not able to perform their work at Eaton; when continued coverage was denied in
2004, the Plan language had changed to allow benefits only for those employees who
were disabled from "any occupation." As defendants have pointed out, the Plan
language did not even require that the plaintiff have an ability to perform such
occupation on a full time basis. Thus, the Eaton plan went from what was, perhaps,
the gold standard in disability policies, i.e., the payment of benefits if you were no
longer able to do your job, to a lead standard that would provide no disability benefits
if the worker retained the ability to engage in any work at the sedentary level. This
standard is below that required to receive Social Security Disability Benefits, which
looks to whether the insured has the residual functional capacity to engage in
substantial gainful activity at the sedentary level. Under the Plan language, Eaton
workers simply cannot receive disability benefits if they are capable of any work,
even part time, at the sedentary level.

**B.    The Purpose and Goal of the Plan**

The court has read the January 1, 2004, SPD in its entirety, and the purpose and goal of the Plan can be discerned from two provisions.  On page one, the Plan provides, as follows:

> The Flexible Benefits Program gives you long term disability options that provide a continued source of income if you are sick or injured and cannot work for an extended period of time.

A.R. 26. The Plan also provides under the section dealing with LTD benefits a definition of "covered disability" as follows:

> You are considered to have a covered disability . . . under the Plan if:
>
> * * *
>
> During the continuation of such total disability following the first 24 months, you are totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which you are, or may become, reasonably well fitted by reason of education, training or experience - - at Eaton Corporation or elsewhere.

A.R. 32.

Thus, the purpose of the LTD Plan is to provide a source of income to employees who are no longer able to work, and the goal of the plan is to provide such benefits only to those who are unable to engage in any work for compensation or profit.

**C.    The Adequacy of the Material Upon which Eaton Decided Plaintiff's Claims and the Degree to Which Such Materials Support the Decision**

The first issue here is whether this court's review is of the underlying and intermediate decisions of Broadspire or whether such review is of the final decision

of Eaton. Eaton has complete discretion to totally ignore the findings of Broadspire. However, the undersigned has determined to review the decisions of both Broadspire and the final decision of Eaton.

The court has closely reviewed the materials upon which Broadspire and, in turn, Eaton relied, as well as the additional materials Eaton generated of its own accord, and finds them to be wholly adequate. Such materials are precisely the type of materials upon which reasonable decision makers rely and provided defendants with substantial evidence that by at least July 1, 2004, plaintiff no longer met the Plan's definition of disability. Such materials, which are outlined above, provide substantial support in the form of expert medical opinions as well as the results of vocational studies and labor market surveys. While such opinions differed from the opinions of plaintiff's treating physicians, it appears that defendants properly discounted certain opinions of treating physicians because they were not supported by objective medical findings. While such disregard of a treating physician's opinion may not have been appropriate in the context of a Social Security Benefits review, it appears that such diminishment was fully in accord with the Plan language which required objective findings. at 152. A.R., at 138. Further, it complies with current case law. In Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), the Supreme Court held that a plan fiduciary is not obligated to accord deference to the opinions of a treating physician over other evidence in the claims file. Unlike Social Security litigation, employee benefit plans such as Eaton's are creations of private enterprise, and just as the sponsoring business may set or even raise the bar for Plan

qualification, they may all set and raise the standard for evidence they will consider, so long as it is promulgated in accordance with ERISA.

**D.      Interpretation Consistent with Plan Provisions and Earlier Interpretations**

The court has read the decisions of other courts that have considered the Eaton LTD plan and cannot find that Eaton has inconsistently applied the Plan to plaintiff in this particular case.  Clearly, with the revisions of the LTD Plan in 2001, Eaton changed course on who would qualify for disability benefits, and persons who either had been determined disabled under the old Plan language or were applying for benefits under the 2004 SPD were going to have to show that they were "totally and continuously unable to engage in any occupation or perform any work for compensation or profit . . . ."  While plaintiff has clearly shown that Eaton's decision to disallow benefits in 2004 is markedly different from its decision in 1999, such a showing is not relevant inasmuch as the Plans bear little resemblance.

**E.      Reasoned and Principled Decision Making**

To the undersigned, this is a factor that is critical to whether the decision maker abused its discretion.  If the decision was not reasoned and principled, the other factors will be of no consequence; equally, a reasoned and principled decision will necessarily be accompanied by positive findings on all the other factors.

**1.      Broadspire's Initial Denial was Reasoned and Principled**

First, it appears reasonable that defendants reasonably reviewed plaintiff's status in 2004.  The undersigned would imagine that nearly all claims that had been

granted under the pre 2001 amendments would have to be reviewed. It also appears that even a cursory review of plaintiffs medical records would give a reviewer pause that plaintiff's condition had either dramatically improved or that she was not disabled under the terms of the newly amended Plan, inasmuch as plaintiff only visited her primary care provider twice in 2003. Further, the notes from those visits provide a reasonable reviewer with indications that plaintiff was able to effectively ambulate, participate in swimming activities on a regular basis, and did not express in 2003 complaints (at least to her doctor) of conditions that a person would consider to be disabling. Further, plaintiff's prescription pain relievers apparently consisted of Celebrex, which is an NSAID (non steroidal anti-inflammatory drug), as are ibuprofen and naproxen.[3]

In conducting its further review of plaintiff's claim in 2004, Broadspire went about its review in both a reasoned and principled manner. In a letter dated June 24, 2004, Broadspire informed plaintiff that, based upon a review of the records provided, she was capable of returning to work, that she was not continuously disabled under the LTD Plan's definition of disability, and that her LTD benefits would cease as of July 1, 2004. A.R. 300-302. This letter described all of the evidence in support of its determination, gave plaintiff information regarding her appeal rights, and explained the objective medical documentation that would be helpful for her to submit on appeal.

---

[3]     The undersigned has taken notice of an official publication of the United States, published by the Food and Drug Administration, for Celebrex at www.fda.gov/cder/drug/infopage/celebrex/celebrex-ptsk.htm.

The undersigned, respectfully, can find no merit to plaintiff's argument that plaintiff could not be found to be disabled as of July 1, 2004, because defendants had paid her LTD benefits through June 2004. This court does not mistake periods of grace for an admissions of liability or coverage. While it may certainly be within the scope of certain Plans for administrators to seek recoupment of any "overpayment," it would appear here that defendants determined to pay plaintiff through the time it became certain or convinced and issued a decision that plaintiff was no longer qualified. This is the manner in which this court would hope all Plan administrators would treat its participants, which is not only reasoned, but principled in that it does not cut off benefits prematurely based on hunches, would could well harm those who actually meet this Plan's strict definition.

### 2. Broadspire's Decision in Response to Plaintiff's Initial Appeal was Reasoned and Principled

The court has also looked closely at Broadspire's decision making process with regard to plaintiff's first appeal. It was at this point that plaintiff positively asserted that she was suffering from a number of ailments:

(1)     severe degenerative osteoarthritis;

(2)     cervical and lumbar degenerative disc disease;

(3)     type II diabetes mellitus;

(4)     obesity;

(5)     chronic pain; and

(6)     systemic lupus erythematosus.

Broadspire responded in a manner that was wholly consistent with the Plan when it fielded plaintiff's allegations to specialists in each area, provided those physicians with available data, and then considered the opinions of those doctors (among other information) in reaching its conclusion on appeal.

As mentioned above, plaintiff took issue with Broadspire's employment of five physicians to review her case. Plaintiff's assignment of error is not, however, well taken, inasmuch as the language of the Plan requires as much, providing that the "appeals process will include consultation with a health care professional with training and experience in the relevant medical field." A.R. 40. In complying with a Plan requirement that was clearly designed to protect participants, Broadspire clearly conducted its appellate review in a reasoned and principled manner.

On March 3, 2005, Broadspire sent a letter to plaintiff denying the December 2004, appeal and upholding its earlier decision A.R. 695-99. Importantly, Broadspire's letter denying this appeal provided plaintiff with the following: (1) its rationale; (2) reference to the applicable Plan language; (3) an extensive and exacting list of the documents that were considered; (4) a summary of plaintiff's impairments; (5) a summary of the Employability Assessment Report; (6) a summary of the Labor Market Survey; a decision; and (7) a notice of appellate rights. Broadspire further advised that "[i]n preparing your appeal, you may request to review any pertinent plan documents." Further, Broadspire cited plaintiff's documentation both before and after the benefits cutoff date of July 1, 2004.

This method of decision making is precisely what courts look for in

determining whether a Claim Administrator acted in a reasoned and principled manner. Broadspire complied with th language of the Plan, fielded medical questions to experts, gathered other critical data such as vocational testing and surveying the labor market, considered the appeal in a timely fashion, considered the claims of plaintiff and her evidence, and issued a written decision detailing not only their conclusions but also their process.

### 3. Final Appeal to Eaton

In the final appeal, counsel for plaintiff raised additional concerns as to Broadspire's methodology as well as additional ailments, going so far as to include in the appeal a poem highlighting the need to consider all of plaintiff's ailments in combination. Broadspire, in preparing the appeal for final review by Eaton, supplemented the record by obtaining the opinions of three additional physicians. Two of those physicians did precisely what plaintiff requested, which was to review plaintiff's ailments in combination. Both independent reviewers reached the same conclusions, which was that plaintiff was not disabled from work as it was defined in this particular plan. The third physician reviewed plaintiff's claims in the area of nephrology.

In certifying the final record to Eaton, plaintiff maintains that Broadspire recommended to Eaton that it affirm its administrative decision and deny plaintiffs claim. Plaintiff contends that this somehow tainted Eaton's decision making process and was improper. The undersigned disagrees both from a common sense aspect and from a consideration of the very language of the Plan. First, common sense dictates

that Eaton well knew, regardless of any written recommendation, that its Claims Administrator had denied plaintiff's claim inasmuch as it would not be appealed to the company unless that had occurred. Second, the language of the Plan does not prohibit Broadspire from making a recommendation: "[t]he review on appeal will be a "fresh" look at the claim without deference to the denial decision." A.R. 40. However, the plan also provides that such "review will take into account all comments . . . submitted that relate to the claim." It simply did not violate the Plan for Broadspire to make a written recommendation to Eaton.

When Eaton received the file, it employed two independent third party medical reviewers, engaged through Medical Review Institute of America (hereinafter "MRIoA") for a comprehensive and total assessment. The court notes that this is precisely the type of review which plaintiff argued in her final appeal that had not been conducted. After reviewing all of the available records, each report provided that plaintiff was not disabled from the Plan's "any occupation" definition. A.R. 69-81. The first physician discussed at length the inconsistencies between plaintiff's affidavit, her self-reported activities, and the objective findings of her treating physicians. A.R. 70-73 & 82-87. This is precisely the type of discussion upon which an ultimate decision maker can base a reasoned and principled decision. See A.R. 74-79. The independent reviewers hired by Eaton both concluded that, based on the entire record and considering plaintiff's ailments in combination that plaintiff was no longer disabled under the terms of the LTD Plan as of July 1, 2004.

Eaton, as Plan Administrator, issued a final determination dated December 9,

2005, which upheld Broadspire's denial of continued LTD benefits after June 30, 2004. A.R.50-67. The court has closely considered this letter of decision, <u>see</u> A. R. 65-66, and included extensive excerpts above. As with the letters from Broadspire, such letter from Eaton reflected careful consideration of plaintiff's claims, the arguments of her counsel, and consideration of all the evidence of record. In her brief the plaintiff argues that the decision of the Fourth Circuit Court of Appeals in <u>Donovan v. Eaton Corporation</u>, 462 F.3d 321 (4th Cir. 2006) compels this court to find that the decision making process used by the defendants was not reasoned and principled. The undersigned has throughly examined and considered the opinion in <u>Donovan</u> and finds that the review and decision making process used in this case by Broadspire and Eaton appears to be much more extensive and thorough than that performed in <u>Donovan</u> .

This factor requires the court to focus on the process that was afforded to plaintiff and her claim and whether the decision making process was both reasoned and principled. Under an abuse of discretion standard, a decision of a Plan Administrator will be found to be reasoned and principled where it is supported by substantial evidence. <u>Bernstein v. Capitalcare, Inc.</u>, 70 F.3d 783, 788 (4th Cir. 1995). "Substantial evidence" is evidence which a reasonable mind would accept as sufficient to support a particular conclusion. <u>LeFebre v. Westinghouse Elec. Corp.</u>, 747 F. 2d 197, 208 (4th Cir. 1984). Defendant does not have the burden of proving a negative; instead, plaintiff has the burden of proving that defendant has abused its discretion. <u>Id.</u> While the undersigned may well have reached a different conclusion,

it appears that such final decision of Eaton is both reasoned and principled.

**F.    Consistent with Procedural and Substantive Requirements of ERISA**

The next issue is whether the Plan administrator's decision is consistent with the procedural and substantive requirements of ERISA. Plaintiff has made no viable challenge to the decision based on procedural or substantive compliance with ERISA. The undersigned finds that the decision of the Plan administrator and that of Eaton are in substantial compliance with ERISA.

**G.    External Standards**

The undersigned has been cited to no external standard that would be applicable to this particular case.

**H.    Fiduciary Motives and Conflicts of Interest**

The undersigned has carefully reviewed the decision of Eaton as the Plan Administrator to determine whether the fiduciary duty to the Plan, its participants, and beneficiaries such as plaintiff has been fulfilled. Plaintiff has shown no conflict of interest under current case law. Plaintiff has challenged the neutrality of a number of the experts employed by defendants, but the alleged bias of an expert is not relevant; rather, it is the bias of a Plan Administrator that is important. Abromitis v. Continental Casualty Co., 2004 U.S.App.Lexis 23310 (4th Cir 2004). There simply is no evidence that any doctor who provided expert opinions or, for that matter, opinions based on treatment, sold their professional integrity or committed perjury.

**V.    Defendant's Motion to Strike**

Defendant has moved to strike plaintiff's arguments as to the mental processes of Eaton's Administrative Committee. Docket Entry 24. The portions of plaintiff's arguments which defendants wish excluded include the following:

> Eaton had to rely on Broadspire's summary of the claim, because none of the members of Eaton's Administrative Committee had any medical credentials. Ex. 4, Defendants' Answer to Interrog. No. 2.

> The record contains no documentation whatsoever of Eaton's deliberations regarding Plaintiff's appeal. In response to Plaintiff's discovery requests, Defendants responded that no notes or minutes of the Eaton Administrative Committee's deliberations ever existed. Ex. 4 Defendants' Responses to Doc. Req. Nos. 9, 10, and Answers to Interrogs. Nos. 3-5. The Committee's deliberations and decision-making process are a mystery.
>
> * * *
>
> On December 1, 2005, a day after receiving the MRIA reports by facsimile, Eaton asked outside counsel, Patricia Shlonsky of the law firm of Ulmer Berne, LLP, to assist it in responding to Plaintiff's appeal. R1002; Ex. 4, Defendants' Answers to Interrogs. Nos. 9, 10.

Pl. Mem., p. 16 and p. 18, respectively. Plaintiff has argued that the Court of Appeals for the Fourth Circuit's decision in Abromitis v. Continental Casualty Co., supra, makes viable discovery and argument outside the administrative record that goes to aiding this court with determining whether the administrative decision was both reasoned and principled. For this reason, the undersigned will recommend that defendants' Motion to Strike be overruled and that the district court consider such arguments of plaintiff as has the undersigned.

As discussed above, the undersigned considered plaintiff's arguments, but cannot read the worst case scenario into such discovery. First, there is no indication that the final decision of Eaton is simply a rubber stamp of Broadspire's determination. Second, there is absolutely no evidence that Eaton departed from the

Plan language or from ERISA. Third, the "fresh look" language of the Plan upon which plaintiff bases these arguments provides notice that the reviewer will consider "all comments, documents, records and other information submitted that relate to the claim," which would necessarily include Broadspire's denials of the claim and any recommendation that it made. A.R. 40. Further, the language of the Plan does not say that the final reviewer will not read or even consider Broadspire's conclusions, but instead provides only that it will not give "<u>deference</u> to the denial decision." <u>Id.</u> (emphasis added). Finally, the undersigned cannot find any requirement under the Plan or ERISA that Eaton's final review committee consist of members with medical expertise, that it hire a court reporter to transcribe its proceedings, or that it is forbidden from employing counsel to assist it.

## VI.    Conclusion

The undersigned has fully considered and weighed the eight factors as provided in <u>Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan</u>, <u>supra</u>, and determined under an abuse of discretion standard that defendants did not abuse their discretion in terminating plaintiff's benefits under the Plan.

In doing so, the court has reviewed every page of the extensive administrative record and from such review this court has developed the opinion that the decision of the Plan Administrator was the product of a reasoned and principled decision making process based upon adequate materials and inquiry, all of which was consistent with the purposes and goals of the Plan.

The undersigned will, therefore, recommend that plaintiff's Motion for

Summary Judgment be denied, that defendant's Motion to Strike be denied, and that defendant's Motion for Summary Judgment be granted, and that the decision of the Plan Administrator be affirmed.

\* \* \*

Finally, the undersigned appreciates the professional manner in which respective counsel have managed this most complex case and thoroughly briefed the issues.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that plaintiff's Motion for Summary Judgment (#18) be **DENIED**, defendant's Motion for Summary Judgment (#20) be **GRANTED**, defendant's Motion to Strike (#24) be **OVERRULED** and **DENIED**, and that the decision(s) of the Plan Administrator be **AFFIRMED**.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: January 18, 2007

Dennis L. Howell
United States Magistrate Judge